**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y.

★ AUG 1 6 2011 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

SANTA MEDINA, *as executor of the estate of Yendy Medina, deceased,*

                Plaintiff,

      -against-

DELTA AIR LINES, INC.,

                Defendant/Third-Party Plaintiff/
                Counter Third-Party Defendant,

      -against-

ARAMARK AVIATION SERVICES LP,

                Defendant/Third-Party Defendant/
                Counter Plaintiff.

-------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**09-CV-4018 (NGG) (LB)**

NICHOLAS G. GARAUFIS, United States District Judge.

      Plaintiff Santa Medina brings this Complaint as the executor of the estate of her late daughter, Yendy Medina ("Medina"), against Delta Air Lines, Inc. ("Delta"), arising from a 2009 traffic accident at LaGuardia Airport ("LaGuardia") in Queens, New York that killed Medina. (Am. Compl. (Docket Entry # 20).) Delta, in turn, brings a Third-Party Complaint against Medina's former employer, Aramark Aviation Services LP ("Aramark"), which asserts claims against Aramark for indemnification and contribution. (3d Party Compl. (Docket Entry # 18).)[1] The following motions are now before the court: Medina's motion for summary judgment against Delta (Pl.'s Mot. (Docket Entry # 87)); Delta's cross-motion for summary judgment with respect to Medina's claims for punitive damages (Def.'s Cross-Mot. (Docket Entry # 92)); and Aramark's motion for summary judgment (3d Party Def.'s Mot. (Docket Entry # 150)). For the

---

[1] Although the court lacks both diversity and federal question jurisdiction over Delta's Third-Party Complaint against Aramark, it will exercise supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367(a). See Viacom Int'l, Inc. v. Kearney, 212 F.3d 721, 727-28 (2d Cir. 2000).

reasons set forth below, the court grants in part and denies in part Plaintiff's motion for summary judgment; grants Delta's motion for summary judgment with respect to punitive damages; and grants in part and denies in part Aramark's motion for summary judgment.

## I.    LEGAL STANDARD

On a motion for summary judgment, the court may consider "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. 56(a). A fact is material if its existence or non-existence "might affect the outcome of the suit under the governing law," and an issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the [non-moving] party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, "the court must draw all reasonable inferences in favor of the nonmoving party." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000).

## II.    BACKGROUND

To service its fleet at LaGuardia, Delta contracted with Aramark to provide cleaning services for its planes. (Katt Aff. Ex. K.)[2] The cleaning of the Delta fleet would take place at various, remote locations at LaGuardia, including an area known as "Echo-Pad." (Id. Ex. B.) Echo-Pad "is a [secure] area at LaGuardia used for aircraft parking that is roughly the size of a football field," approximately 2.9 miles from the Delta terminal. (Def.'s Opp'n (Docket Entry

---

[2] For reasons not understood by the court, Plaintiff has failed to electronically file Delta attorney William J. Katt's affidavit in opposition to Plaintiff's motion for summary judgment. The court orders Plaintiff's counsel to electronically file the Katt Affidavit—as a single docket entry—within ten days of the date of this Memorandum and Order.

# 89) at 1.) Typically, a plane requiring custodial service would be parked at Echo-Pad, or another aircraft parking location, and Delta would notify Aramark that the plane required cleaning. (Katt Aff. Ex. C.) Aramark would then notify Delta that it needed access to the plane: specifically, stairs to allow its employees on and off the plane. (Id.) Aramark would then drive its employees to Echo-Pad and drop them off at the plane site with any necessary equipment. (Id.) The employees would then wait for a Delta employee to bring a set of movable stairs to enable them to board the plane. (Id.)

Prior to her death, Medina was employed by Aramark to clean Delta planes. (Id. Ex. A.) At around 3:00 a.m. on July 29, 2009, Delta notified Aramark that three of its planes parked at Echo-Pad needed servicing. (Pl.'s Mem. (Docket Entry # 87) at 14-15.) At approximately 3:30 a.m., Aramark notified Delta that it needed movable stairs to access the planes. (Id. at 15.) Shortly thereafter, Aramark employees Ivan Cruz ("Cruz") and Jackson Abreu drove a crew of cleaners out to Echo-Pad to service the three planes that required service. (Id.) Medina was part of one crew that also included Ramon Villavicencio, Wladimiro Chavez-Veliz ("Chavez-Veliz"), and Alicia Maurath, who were responsible for cleaning a Delta 757. (Def.'s Opp'n at 1.) The 757 crew arrived at their plane around 3:40 a.m. and were dropped off with their equipment. (Pl.'s Mem. at 15.) Because no stairs were on site, the 757 crew were not able to board the plane to begin working. (Id.) Instead, they waited on the tarmac for a Delta employee to bring stairs. (Def.'s Opp'n at 2.)

Echo-Pad had no benches or chairs for the 757 crew to sit down on while waiting for the stair-truck. (Pl.'s Mem. at 16.) Tired of waiting on Echo-Pad's asphalt, some of the 757 crew members began to sit down next to the plane. (Id.) Chavez-Veliz leaned against the front wheel

3

of the plane as if it were a chair. (Id. at 17.) Medina lay down on the ground about seven feet away from the front wheel of the plane. (Id.)

At approximately 4:45 a.m.—an hour after the 757 crew had been dropped off at their plane—a Delta employee, Scott McEntee ("McEntee"), drove a pickup truck to the 757 site to monitor the situation regarding stairs. (Def.'s Opp'n at 2.) McEntee pulled up to the 757, facing it, approximately ten to fifteen feet from the front wheel. (Id.) Cruz then arrived at the 757 site and pulled up his car on the left side of McEntee's truck, facing the same direction. (Id.) It is unclear whether McEntee and Cruz conversed at this point. (Pl.'s Mem. at 19.) After about five minutes, McEntee began driving away from Cruz's van, toward the plane. (Id. at 20.) McEntee initially banked left, and then swung right. (Id.) As McEntee was turning right, he ran over Medina, who was lying on the tarmac. (Id.)

McEntee exited his vehicle and realized that he had just run over Medina. (Def.'s Opp'n at 3.) McEntee did not call 911, nor did he tell anyone else to call 911. (Pl.'s Mem. at 21.) Nor did McEntee have in his possession a radio to call anyone else to inform them that an accident occurred. (Id. at 22.) As a consequence, the Port Authority of New York and New Jersey (the "Port Authority") was not notified of the accident until eight minutes after it occurred; emergency medical services was not notified until two minutes later; and paramedics did not arrive at the scene until four minutes thereafter, at 5:14 a.m. (Id. at 23.) For *fourteen minutes*, Medina lay on the tarmac, dying, without any medical assistance whatsoever. (See id.) Medina was taken to a hospital where she subsequently died. (Def.'s Opp'n at 3.) On September 17, 2009, Medina's mother, now the executor of her estate, filed this Complaint against Delta. (See Compl.)

4

## III.    DISCUSSION

### A.    Plaintiff's Motion for Summary Judgment Against Delta

Plaintiff moves for summary judgment against Delta under two common-law theories of negligence: (1) that McEntee was negligent in failing to observe Medina lying on the tarmac while driving his vehicle; and (2) that McEntee was negligent in failing to operate his vehicle within the speed limit while on Echo-Pad.[3]  (Pl.'s Mem. at 27, 37.)  Plaintiff argues that McEntee's negligence under either of these theories was the proximate cause of Medina's death. (Id. at 27, 37.)  Plaintiff also asserts that if McEntee is found to be negligent, Delta is liable under the doctrine of respondeat superior.  (Id. at 27.)  Delta argues that Plaintiff's motion should be denied due to the lack of a statement of undisputed facts as required by Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York (the "Local Civil Rules"), (Def.'s Opp'n at 7-8), and, in any event, that McEntee was not negligent in his operation of the truck and that Medina was comparatively negligent because she was lying down on the tarmac at the time of the accident (id. at 8-17).

### 1.    Lack of a Rule 56.1 Statement

Local Civil Rule 56.1 requires a party moving for summary judgment to "annex[] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried," i.e., a Rule 56.1 statement.  Loc. Civ. R. 56.1.  "Failure to submit such a statement may constitute grounds for denial of the motion."  Id.  Nonetheless, a court "may in its discretion opt to review the record independently even where one of the parties has failed to file such a statement."  Pugni v.

---

[3] Because this case comes to federal court via diversity jurisdiction, see 28 U.S.C. § 1332(a)(1), substantive New York state-law applies.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941).

Additionally, although this case stems from a motor-vehicle accident, New York's no-fault insurance law does not apply because Plaintiff has alleged, and Delta does not contest, that Medina died as a result of the accident, and therefore suffered a "serious injury" under the statute.  See N.Y. Ins. Law § 5104(a).

Reader's Digest Ass'n, Inc., No. 05-cv-8026 (CM), 2007 WL 1087183, at *2 (S.D.N.Y. Apr. 9, 2007) (citing Monahan v. N.Y.C. Dep't of Corr., 214 F.3d 275, 292 (2d Cir. 2000)). Plaintiff argues that the court should not deny her motion for failing to provide a Rule 56.1 statement because she has included a "statement of facts" section in her brief with citations to the record. (Pl.'s Reply (Docket Entry # 88) at 4.) But Plaintiff's statement of facts are not a statement of *undisputed* facts—the point of a Rule 56.1 statement. The purpose of this court's long-standing practice in requiring Rule 56.1 statements is to help the court separate those facts ripe for summary judgment from the fruit intended for a jury. This is especially important in a factually complicated and vigorously litigated case such as this. Plaintiff's counsel's failure to file a Rule 56.1 statement is inexcusable; he has been admitted to practice in this court for nine years (see Docket Entry # 164) and should be well aware of court practice. Nonetheless, the court does not consider this defect to be fatal; it will "conduct an assiduous review of the record," Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001), despite Plaintiff counsel's neglect.

### 2. Negligence for Failing to Observe Medina

In New York, a claim for negligence consists of three elements: "(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." Akins v. Glens Falls City School Dist., 53 N.Y.2d 325, 333 (1981). In general, the existence of a duty may arise either under common law principles or by statute. See Lopes v. Rostad, 45 N.Y.2d 617, 623 (1978). In the motor vehicle accident context, a defendant has "a statutory duty to use due care to avoid colliding with pedestrians on the roadway, as well as a common-law duty to see that which he should have seen through the proper use of his sense." Barbieri v. Vokoun, 900 N.Y.S.2d 315, 318 (N.Y. App. Div., 2d Dep't 2010) (citing N.Y. Veh. & Traf. Law § 1146 and Domanova v. State of New York, 838 N.Y.S.2d 644, 645 (N.Y. App. Div., 2d Dep't 2007)).

6

New York Vehicle and Traffic Law ("V.T.L.") § 1146 generally defines the duty of care required of drivers within New York State. See N.Y. Veh. & Traf. Law § 1146. Section 1642, however, allows cities of over one million people, i.e., New York City, to enact traffic ordinances that supersede state law.[4] Id. § 1642. Accordingly, New York City has enacted the New York City Traffic Regulations. Section 4-04(d) of those regulations sets forth the duty of care owed to pedestrians: "the operator of a vehicle shall exercise due care to avoid colliding with any pedestrian."[5] 34 N.Y.C. R. & Reg. § 4-04(d); see also Ferguson v. Iqbal, 823 N.Y.S.2d 180, 181 (N.Y. App. Div., 2d Dep't 2006) (upholding a jury instruction under New York City Traffic Regulation § 4-04(d) as superseding V.T.L. § 1146). This standard of *due* care is "the same duty of care [applicable to] any other potential tortfeasor—reasonable care under all of the circumstances of the particular case." Bethel v. N.Y.C. Transit Auth., 92 N.Y.2d 348, 356 (1998).

There are genuine issues of material fact regarding whether McEntee exercised reasonable care in his operation of the truck, or should have seen Medina "through the proper use of his sense." See Barbieri, 900 N.Y.S.2d at 318. First, it is unclear whether McEntee actually saw Medina as she lay on the tarmac waiting to board the 757. (Compare Pl.'s Mem. at 19 with Def.'s Opp'n at 3.) It also unclear whether McEntee was even capable of seeing Medina given the lighting conditions of the area and the angle of the truck's hood. (Def.'s Opp'n at 9.) Furthermore, it is unclear whether McEntee *should have* seen Medina, given the conditions at Echo-Pad. (See id. at 9-10) The parties dispute whether Medina would have been in McEntee's field of vision as Cruz pulled up alongside him; whether McEntee was aware of the number of

---

[4] Not only is New York City the only city in New York State with a population of over one million, it is the only city in the state's existence to have a population of over one million. See generally Barbara Shupe et al., New York State Population, 1790-1980: A Compilation of Federal Census Data (1987).

[5] This is substantively identical to V.T.L. § 1146, which requires that "every driver of a vehicle shall exercise due care to avoid colliding with any bicyclist, pedestrian, or domestic animal."

employees in the 757 crew and therefore should have assumed that some employees may not have been in his field of vision; whether McEntee should have otherwise known that Aramark employees may have been lying on the tarmac; and whether McEntee should have taken extra precautions to spot Aramark employees given the conditions of Echo-Pad that evening. (Compare Pl.'s Mem. at 27-39 with Def.'s Opp'n at 9-12.) The resolution of these issues will certainly affect the outcome of the instant suit and a reasonable jury could find for either Plaintiff or Delta. See Anderson, 477 U.S. at 248 (1986). Therefore, "[i]t is the role of a jury to determine the[se] factual issues." Hyowon Kim v. Cruz, No. 08-cv-8905 (RMB) (GWG), 2009 WL 5103157, at *2 (S.D.N.Y. Dec. 17, 2009). The court denies Plaintiff's motion for summary judgment against Delta on the issue of McEntee's alleged failure to observe Medina.

### 3. Negligence for Failing to Observe Echo-Pad's Speed Limits

Plaintiff also argues that McEntee was negligent for failing to observe a speed limit prescribed for Echo-Pad by the Port Authority. (Pl.'s Mem. at 37.) Plaintiff provides no evidence, however, of whether there was a valid speed limit at Echo-Pad. Plaintiff's only evidence on this point, as cited in her brief, is that some Aramark workers *believed* there to be a speed limit. (See id.) This is insufficient to show that the Port Authority did, in fact, establish a speed limit for Echo-Pad or had the authority to do so, or that the violation of such a speed limit would constitute either negligence per se or the breach of a common law duty giving rise to a negligence claim. Because Plaintiff provides no evidence on these points, Plaintiff's motion for summary judgment on the issue of McEntee's failure to follow Port Authority speed regulations is denied.

### 4. Delta's Liability for McEntee's Alleged Negligence

Plaintiff argues that, in the event McEntee is found to be negligent, Delta should be liable to Plaintiff under a theory of respondeat superior. (Pl.'s Mem. at 27, 42.) In New York, the

doctrine of respondeat superior makes employers liable for the negligent acts of their employees performed in the scope of their duties. Krynski v. Chase, 707 F. Supp. 2d 318, 328-29 (E.D.N.Y. 2009); McDuffie v. Wilner, 415 F. Supp. 2d 412, 419 (S.D.N.Y. 2006); see also Lundberg v. State of New York, 25 N.Y.2d 467, 470 (1969) (defining respondeat superior in the motor vehicle negligence context). Further, under V.T.L. § 388,

> [e]very owner of a vehicle used or operated in this state shall be liable and responsible for death or injuries to person or property resulting from negligence in the use or operation of such vehicle, in the business of such owner or otherwise, by any person using or operating the same with the permission, express or implied, of such owner.[6]

This statute operates in parallel with New York's common-law doctrine of respondeat superior.[7] See McDuffie, 415 F. Supp. 2d at 419.

Although it is unclear whether Delta owned the vehicle used by McEntee in the accident, no party contests that McEntee used the vehicle in the scope of his employment: the accident occurred in the direct course of McEntee organizing the retrieval of movable stairs on Echo-Pad to allow Aramark workers to board Delta's planes to clean them. (See Def.'s Opp'n at 2-3.) Further, no party contests that McEntee had permission to use the vehicle to do his job. (See id.) Therefore, to the extent McEntee's negligence in this task was the proximate cause of Medina's death, Delta would be liable to Plaintiff under respondeat superior. See Krynski, 707 F. Supp. 2d at 328-29. Moreover, to the extent it is proven at trial that Delta owned the vehicle that struck Medina, Delta would be also liable to Plaintiff under V.T.L. § 388. See Country Wide Ins. Co.

---

[6] In 2005, the Safe, Accountable, Flexible, Efficient Transportation Equity Act ("SAFETEA"), 49 U.S.C. § 30106, preempted V.T.L. § 388 with respect to the owners of rented and leased cars. See Green v. Toyota Motor CreditCorp, 605 F. Supp. 2d 430, 433-34 (E.D.N.Y. 2009). But V.T.L. § 388 is still operative with respect to employee-drivers' use of their employer-owners' vehicles. See Country Wide Ins. Co. v. Nat'l R.R. Passenger Corp., 6 N.Y.3d 172, 174 (2006) (discussing standards of proof required by a defendant under V.T.L. § 388 to rebut the presumption of employer-owner permission after SAFETEA).

[7] New York City has not enacted superseding liability regulations to V.T.L. § 388 despite its authority to do so. See N.Y. Veh. & Traf. L. § 1146. Therefore, the substantive provisions of V.T.L. § 388 control.

v. Nat'l R.R. Passenger Corp., 6 N.Y.3d 172, 174 (2006). Therefore, Plaintiff's motion for summary judgment on this issue is granted.

### 5. Comparative Negligence of Medina

Plaintiff also seeks to preempt Delta's affirmative defenses that Medina was comparatively negligent. (Pl.'s Mem. at 39-42.) New York's substantive law regarding comparative negligence is embodied in New York's Civil Practice Law and Rules ("C.P.L.R.") § 1411:

> In any action to recover damages for personal injury, injury to property, or wrongful death, the culpable conduct attributable to the claimant or to the decedent, including contributory negligence or assumption of risk, shall not bar recovery, but the amount of damages otherwise recoverable shall be diminished in the proportion which the culpable conduct attributable to the claimant or decedent bears to the culpable conduct which caused the damages.

Accordingly, to the extent a plaintiff was contributorily negligent in bringing about her injury, any amount she recovers from the defendant may be diminished by the proportion of her fault. See Elliott v. Club Med Sales, Inc., No. 99-cv-1202 (DAB), 2004 WL 541843, at *4 (S.D.N.Y. Mar. 19, 2004) (applying C.P.L.R. § 1411 in a diversity action).

There are genuine issues of material fact as to Medina's alleged comparative negligence. It is unclear where, exactly, Medina was lying at the time of the accident; whether she was sleeping or alert when she was struck; and whether it was common for Aramark workers to lie on the tarmac while waiting for movable stairs to arrive. (Compare Pl.'s Mem. at 11, 15, 19-21 with Def.'s Opp'n at 9-12.) Therefore, the court will not decide whether or to what degree Medina was comparatively negligent in her own death, and reserves this issue for the jury. See Boutsis v. Home Depot, 371 F. App'x 142, 144 (2d Cir. 2010) (quoting Tuthill v. United States, 270 F. Supp. 2d 395, 399 (S.D.N.Y. 2003) ("It is well settled that comparative negligence must be

determined by a jury, and therefore cannot be decided on a summary judgment motion.")).

Therefore, this aspect of Plaintiff's motion for summary judgment is denied.

## B.     Delta's Cross-Motion for Summary Judgment on Punitive Damages

Delta cross-moves for summary judgment against Plaintiff on Plaintiff's claim for

punitive damages. (Def.'s Cross-Mot. (Docket Entry # 92).) Delta argues that punitive damages

are not proper against an employer where it is liable to the plaintiff under a doctrine of

respondeat superior. (Def.'s Mem. to Cross-Mot. (Docket Entry # 92) at 7-9.) Delta is generally

correct. To establish a claim for punitive damages under a theory of respondeat superior, a

plaintiff must demonstrate that the employee's "level of responsibility within the entity [was]

sufficiently high that his participation in the wrongdoing render[ed] the employer blameworthy."

Loughry v. Lincoln First Bank, N.A., 67 N.Y.2d 369, 381 (1986). The employee's position must

be significant enough to "arouse the 'institutional conscience' for corrective action, [in order to]

serv[e] both the punishment and the deterrence goals of punitive damages." Id. This is generally

reserved for "superior officers" who have a "significant managerial function." See id.[8]

In its Rule 56.1 Statement, to which Plaintiff does not respond,[9] Delta describes Scott

McEntee as "an aircraft mechanic . . . assigned by his supervisor to travel to Echo Pad in order to

open the subject aircraft." (Def.'s Cross-Mot. Rule 56.1 Statement (Docket Entry # 92) ¶ 10.)

Even "draw[ing] all reasonable inferences in favor of [Plaintiff]," see Reeves, 530 U.S. at 149,

nothing suggests that McEntee could be considered a "superior officer" who had a "significant

managerial function," or otherwise possessed a level of responsibility in Delta's corporate chain

---

[8] In the event Delta is found liable to Plaintiff under V.T.L. § 388, making employer-owners of vehicles liable for the torts of their employee-drivers, this standard equally applies. See Marcoux v. Farm Servs. & Supplies, Inc., 283 F. Supp. 2d 901, 912-14 (S.D.N.Y. 2003) (citing Ingle v. Mark, 296 N.Y.S.2d 664, 665-66 (N.Y. Sup. Ct., Queens Cnty. 1969)).

[9] See the court's discussion regarding Plaintiff's treatment of Rule 56.1 statements, Part III.A.1.

of command high enough to "arouse the 'institutional conscience.'" See Loughry, 67 N.Y.2d at 381.

Plaintiff does not substantively contest this characterization of McEntee as a lower-level employee in Delta's organization. Rather, Plaintiff argues that she "has never based her claim for punitive damages on the actions of McEntee" but that "it is plaintiff's claim that defendant's failure to have a communication policy in place, particularly with respect to emergency situations, was reckless so as to amount to a conscious disregard of the rights of others." (Pl.'s Opp'n to Def.'s Cross-Mot. (Docket Entry # 97) at 5.) Yet Plaintiff's characterization of her claims is utterly belied by her own filings. First, Plaintiff says nothing in her Amended Complaint about how any communication policy—emergency or otherwise—was the proximate cause of Medina's death. The operative paragraph of Count One, for example, lists twelve different ways Delta was allegedly negligent in its "ownership, operation, management, maintenance and control of their motor vehicle," sans communication policy. (Am. Compl. ¶ 31.) Count Three, Plaintiff's punitive damages count, simply states that "[t]he actions of the defendant were willful . . . and exhibited such recklessness, depravity and wanton disregard for the safety of the decedent that plaintiff seeks punitive damages." (Id. ¶ 42.) Allegations concerning Delta's communication policies, or lack thereof, are nowhere to be found. Second, Plaintiff's *own* motion for summary judgment on liability states that McEntee's "actions were a proximate cause of decedent's death and [] the doctrine of respondeat superior applies to the matter at bar." (Pl.'s Mot. at 27.) Again, no suggestion that Medina died as a result of *any* Delta policy. Plaintiff's characterization of her negligence claims as being grounded in Delta's lack of an emergency communication policy simply does not reflect Plaintiff's theory of her case up until this point.

Without any substantive counterargument concerning McEntee's status in Delta's organization, Plaintiff cannot defeat Delta's motion for summary judgment. Indeed, it appears to be clear that Plaintiff seeks to attach liability to Delta solely arising from the use and operation of the vehicle that struck Medina. Because this is not enough to impose punitive damages on Delta, the court grants Delta's motion for summary judgment.

## C. Aramark's Motion for Summary Judgment Against Delta

Aramark also moves for summary judgment against Delta, seeking to: (1) extinguish Delta's contractual indemnification claim against Aramark; and (2) dismiss Delta's claims for common-law contribution from Aramark. (3d Party Def.'s Mem. (Docket Entry # 151) at 2.)

### 1. Lack of Contractual Indemnification for Delta's Negligence

Aramark argues that the services contract between it and Delta, the Airport Services Master Agreement (the "Agreement"), dictates that it has no duty to indemnify Delta. (Id. at 2.) Aramark attaches the Agreement as an exhibit to its motion for summary judgment. (3d Party Def.'s Mem. Ex. HH ("Agreement").) Delta does not contest the legitimacy of the Agreement, only that it is premature to decide issues of indemnity prior to determining legal fault. (See 3d Party Pl.'s Counter Rule 56.1 Statement (Docket Entry # 159).) But numerous cases have decided similar motions for summary judgment prior to a determination on the issue of liability. See Gomez v. Preferred Rentals, No. 96-cv-2725 (LAP), 1997 WL 749389, at *8 (S.D.N.Y. Dec. 3, 1997) (collecting cases). Delta's argument concerning the ripeness of Aramark's motion therefore fails.

The pertinent part of the Agreement provides:

> To the fullest extent permitted by law, [Aramark] shall release, indemnify, defend and hold harmless Delta . . . from and against all claims, damages, losses, . . . liabilities, judgments, costs, and expenses of any kind or nature whatsoever (including but not limited to interest, court costs, and attorney's fees), which in any way arise out of or result from any act(s) or omission(s) by [Aramark] (or

13

anyone directly or indirectly employed by [Aramark] or anyone for whose acts [Aramark] may be liable) in the performance or nonperformance of Services or other obligations under this Agreement . . . including but not limited to injury to or death of any person. . . and liability of obligations under or with respect to any violation of federal, state, and local laws, regulations, rules, codes and ordinances . . . .

However, nothing contained in this Section shall be construed as a release or indemnity by [Aramark] of [Delta] from or against loss, liability or claim to the extent arising from the negligence or willful misconduct of [Delta] . . . .

(Agreement at 18.) Aramark argues that Plaintiff's claim "aris[es] from the negligence or willful misconduct" of Delta, and therefore, Aramark should not be required to indemnify Delta. (3d Party Def.'s Mem. at 8-11.) Delta counters that the claims against it "arise out of . . . an[] act[] . . . by . . . [some]one directly . . . employed by [Aramark] . . . in the performance or nonperformance. . . of Services or other obligations . . . under this Agreement." (3d Party Pl.'s Opp'n (Docket Entry # 95) at 8-11.) Specifically, Delta argues that Aramark should indemnify it to the extent that either Aramark's failure to properly train and supervise Medina or Medina's alleged comparative negligence contributed to the accident. (Id.)

### a.  Choice of Law

In New York, a court interpreting "a contract with an express choice of law provision . . . is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." Aramarine Brokerage, Inc. v. OneBeacon Ins. Co., 307 F. App'x 562, 564 (2d Cir. 2009). Even where a party has sufficient contacts with the chosen state, however, the court should be hesitant to apply the law of the agreed-upon forum where there is "fraud, violation of public policy, or no reasonable basis for choosing the law of the jurisdiction designated by the parties." Id. (internal punctuation omitted). Section 15 of the Agreement provides that it is to be governed according to the law of Georgia, the state of Delta's principal place of business. (Agreement at 20; see also 3d Party Pl.'s Compl. ¶ 4.) The court is not aware

14

of, nor do the parties provide, any authority suggesting that indemnification provisions in out-of-state contracts violate any public policy of New York State. See Torain v. Clear Channel Broad., Inc., 651 F. Supp. 2d 125, 138 (S.D.N.Y. 2009) (applying Texas choice-of-law provision to out-of-state indemnification agreement); Allianz Ins. Co. v. Otero, 353 F. Supp. 2d 415, 423 (S.D.N.Y. 2004) (applying New Jersey choice-of-law provision to out-of-state indemnification agreement). Nor does either party raise any allegations of fraud or lack of reasonable basis for the Georgia law provision. Accordingly, the court will apply Georgia law in interpreting the Agreement.

### b.    *Interpretation of the Agreement*

In Georgia, "[w]henever the language of a contract is plain, unambiguous, and capable of only one reasonable interpretation, no construction is required or even permissible, and the contractual language used by the parties must be afforded its literal meaning." First Data POS, Inc. v. Willis, 273 Ga. 792, 794 (2001). Where the language of a contract is not so plain, the contract is to be construed against an intention to indemnify, "and every presumption is against such intention." Ryder Integrated Logistics Inc. v. BellSouth Telecomms., Inc., 281 Ga. 736, 738 (2007) (quoting Allstate Ins. Co. v. City of Atlanta, 202 Ga. App. 692, 693 (1992)). Nonetheless, even where a contract's language is plain, indemnification provisions based on the sole negligence of the indemnitee are unenforceable in Georgia as a matter of public policy. See id. at 740; United Parcel Serv., Inc. v. Colt Sec. Agency, Inc., 296 Ga. App. 815, 817 (2009) (interpreting Ryder). This aversion to indemnification agreements extends to situations where a party seeks indemnification for claims arising out of an indemnitor's plaintiff-employee's contributory negligence. United Parcel Serv., 296 Ga. App. at 817-18. In these circumstances, the party may not seek indemnification from the indemnitor-employer, even where the plaintiff-

15

employee has contributed to her injury. Id. Rather, the employee's contributory negligence will merely offset the amount recoverable to the plaintiff-employee. Id.

As an initial matter, Delta cannot use Medina's alleged contributory negligence as a basis for indemnification. To the extent that Medina's alleged contributory negligence will offset Plaintiff's potential recovery under a comparative negligence regime, as is the case in New York, see N.Y. C.P.L.R. § 1411, Georgia bars such agreements as a matter of public policy, presumably because they amount to a double-recovery for the defendant despite the defendant's own negligence. See United Parcel Serv., 296 Ga. App. at 817-18.

Regarding any remaining theory that supports contractual indemnification, the Agreement contains two competing provisions. The first purports to indemnify Delta against any "claim[] . . . which in any way arise out of or result from any act(s) or omission(s) by [Aramark] . . . in the performance or nonperformance of Services or other obligations under this Agreement," e.g., the operational and safety training of Aramark employees. (Agreement at 3, 18.) The second excludes indemnity for any claim "to the extent [it] aris[es] from the negligence or willful misconduct of [Delta]." (Id. at 18.) Because the issue of negligence has yet to be decided, these dueling provisions contemplate three potential scenarios at trial: (i) Delta is not found to be negligent and the accident somehow arose out of Aramark's failure to perform its obligations under the Agreement, such as failing to provide Medina with proper safety training; (ii) Delta is found to be negligent and the accident did not arise out of Aramark's failure to perform any of its obligations under the Agreement; or (iii) Delta is found to be negligent *and* the accident *also* arose out of Aramark's failure to perform its obligations under the Agreement.[10]

---

[10] We do not consider whether indemnification would be required if Delta is not found to be negligent and Aramark did not fail to perform any of its obligations under the Agreement.

In Scenario I—Delta is not negligent, Aramark breached the Agreement, and the accident arose out of that breach—the language of the contract "is plain, unambiguous, and capable of only one reasonable interpretation": Plaintiff's claim arose out of Aramark's performance or nonperformance of its obligations under the Agreement. See First Data POS, 273 Ga. at 794; (Agreement at 18). In this Scenario, Aramark would clearly be required to indemnify Delta against Plaintiff's claims.

In Scenario II—Delta is negligent and Aramark did not breach the Agreement—the language of the Agreement and Georgia public policy disfavor any indemnification. The language of the Agreement specifically excludes indemnification from any claims "to the extent arising from the negligence or willful misconduct of [Delta]." (Agreement at 18.) Further, Georgia law prohibits indemnification for a tortfeasor's sole negligence. See Ryder, 281 Ga. at 740.

In Scenario III—Delta is negligent, Aramark breached the Agreement, and at least a portion of the accident arose out of that breach—the language Agreement is not so "plain" as to render it "capable of only one reasonable interpretation." See First Data POS, 273 Ga. at 794. It is unclear whether the language, "[N]othing contained in this Section shall be construed as a release . . . against loss, liability or claim to the extent arising from the negligence . . . of [Delta]" (Agreement at 18), means that the parties have intended to completely prohibit indemnification from a claim arising from Delta's negligence, or whether the parties intended to proportionally reduce indemnification "to the extent" a claim arises from Delta's negligence. Because the Agreement is unclear on this point, "every presumption is against [Aramark's] intention" to indemnify Delta under Scenario III. See Ryder, 281 Ga. at 738. Consequently, if it is proven at

trial that Delta was even partially negligent in causing Medina's death, Aramark will not be required to indemnify Delta.

As discussed above, because there are still outstanding issues of material fact which will control which Scenario applies, Aramark's motion for summary judgment on the issue of contractual indemnification is denied.

### 2. Common Law Contribution

Delta claims that Aramark was "negligent, reckless, and careless" in its training and supervision of Aramark employees. (3d Party Compl. ¶ 12.) In its motion for summary judgment, Aramark argues that Delta's common-law contribution claim should be dismissed because: (1) Delta's alleged negligence was the sole proximate cause of the accident; (2) in the alternative, Aramark's alleged failure to supervise Medina was not the proximate cause of the accident; and (3) as a matter of New York law, there is no liability for failing to train an employee in a "common and ordinary task." (3d Party Def.'s Mem. at 3-8.)[11]

Under New York law, a party may not assert a claim for contribution arising out of damages resulting from a breach of contract. See Bd. of Educ. of the Hudson City School Dist. v. Sargent, Webster, Crenshaw & Foley, 71 N.Y.2d 21 (1987). Rather, a common law contribution claim may only be predicated on actions sounding in tort. Id. Therefore, to establish a claim for common law contribution, a plaintiff must prove that the party from whom contribution is sought was itself a tortfeasor. See Mas v. Two Bridges Assocs. by Nat'l Kinney Corp., 75 N.Y.2d 680, 691 (1990). In the context of third-party claims for contribution, "a third-party plaintiff is required to show that the third-party defendant owed it a duty of reasonable care independent of its contractual obligations, or that a duty was owed to the plaintiff[] . . . and that a

---

[11] New York law does not prohibit a common-law contribution claim where the third-party plaintiff also asserts a contractual indemnification claim against the third-party defendant. See Mas v. Two Bridges Assocs. by Nat'l Kinney Corp., 75 N.Y.2d 680, 691 (1990).

breach of that duty contributed to the alleged injuries." Guerra v. St. Catherine of Sienna, 913 N.Y.S.2d 709, 710 (N.Y. App. Div., 2d Dep't 2010).

New York law does not impose a duty to train or supervise employees who were injured in "common and ordinary activities." See Consol. Edison Co. of N.Y., Inc. v. Vilsmeier Auction Co., 800 N.Y.S.2d 690, 693 (N.Y. App. Div., 2d Dep't 2005). An employer is not liable for failing to train or supervise an employee if the activity is "ordinary," e.g., walking down stairs, Viskovic v. ENK Enterprises Inc., 723 N.Y.S.2d 518, 519 (N.Y. App. Div., 2d Dep't 2001), or descending a ladder, Hernandez v. Bd. of Educ. of City of N.Y., 694 N.Y.S.2d 752, 752 (N.Y. App. Div., 2d Dep't 1999). Nor is it liable if the activity is "common" to the plaintiff's job such that the plaintiff had performed the activity safely many times before. See Viskovic, 723 N.Y.S.2d at 519 (concluding that no liability existed where the injurious act "had been performed by the injured plaintiff many times before the accident without incident"); Souffrant v. Quality Wholesale Veal Ctr., 521 N.Y.S.2d 696, 696 (N.Y. App. Div., 1st Dep't 1987) (determining that defendants were not liable for contribution where plaintiffs "had previously performed the same task many times before on their own, without defendant's assistance"); Dupper v. Conrail, 501 N.Y.S.2d 910, 912 (N.Y. App. Div., 2d Dep't 1986) (dismissing a third-party complaint where injured plaintiff had performed the task of opening and unloading train boxcars safely "on hundreds of prior occasions").

In Consalvo v. City of New York, 861 N.Y.S.2d 404, 406 (N.Y. App. Div., 2d Dep't 2008), a New York City Department of Sanitation worker was instructed to retrieve a dead cat in the middle of a roadway. Id. at. 405. After entering the roadway to retrieve the carcass, the sanitation worker was struck and killed by a hit-and-run driver. Id. The sanitation worker's estate then sued the New York City Department of Sanitation, alleging, among other things, that

it was negligent in failing to train the decedent with respect to road safety. Id. The Appellate Division reversed the trial court's denial of summary judgment on the grounds that the decedent "was an experienced sanitation worker, that it was part of his work to pick up dead animals from the roadway, and that the risks inherent therein, including the risk of being struck by a car, were readily observable." Id. at 406.

In this case, even "draw[ing] all reasonable inferences in favor of [Delta]," Reeves, 530 U.S. at 149, Aramark's motion for summary judgment establishes that it had no common law duty to train Medina in road safety. There is no genuine issue of material fact that Medina was an experienced plane cleaner (3d Party Def.'s Rule 56.1 Statement (Docket Entry # 152) ¶¶ 6-7, 9); that it was part of her work to wait on the tarmac prior to entering the plane (id. ¶ 13); and that the risk of being struck by a car on the tarmac should have been readily observable. See Consalvo, 861 N.Y.S.2d at 406. Without a common law duty to train Medina in road safety, Aramark could not have been negligent in failing to provide such training. See Mas, 75 N.Y.2d at 691. Therefore, as a matter of law, Delta cannot sustain a common law contribution claim against Aramark for any alleged failure to train Medina in road safety. See Guerra, 913 N.Y.S.2d at 710. Aramark's motion for summary judgment as to the issue of common law contribution is granted.

## IV. CONCLUSION

As discussed above, the court ORDERS Plaintiff's counsel to electronically file the Katt Affidavit as a single docket entry within ten days of the date of this Memorandum and Order. Consistent with this opinion, the court further GRANTS IN PART and DENIES IN PART Plaintiff's motion for summary judgment; GRANTS Defendant's motion for summary judgment

with respect to punitive damages; and GRANTS IN PART and DENIES IN PART Third-Party

Defendant's motion for summary judgment.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
     August _15_ , 2011

NICHOLAS G. GARAUFIS ᐯ
United States District Judge